**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**DONNA K. SOUTTER,**
**For himself and on behalf of all**
**Similarly situated individuals,**

**Plaintiff**

v.                                        **CASE NO. 3:10CV514-HEH**

**TRANS UNION, LLC,**

**Defendant.**

**PLAINTIFF'S MEMORANDUM IN SUPPORT**
**OF MOTION FOR FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT, FOR AWARD OF ATTORNEYS' FEES,**
**EXPENSES AND CLASS REPRESENTATIVE SERVICE AWARD**

COMES NOW the Plaintiff, Donna K. Soutter (hereafter "Plaintiff" or "Soutter") by

counsel, and with the consent of the Defendant, Trans Union LLC (hereafter "Defendant" "Trans

Union" or "TU") by counsel, and in support of the Motion for Final Approval of Class Action

Settlement, for Award of Attorneys Fees, Expenses and Class Representative Service Award,

supplies this memorandum of law.

I.      **OVERVIEW**

This class settlement is made on behalf of consumers who were the subject of a TU

consumer report in which TU reported as unpaid Virginia state-court judgments that in fact had

been satisfied, vacated or appealed.  After contentious litigation between two teams of attorneys,

and multiple mediation attempts, initially before a retired United States District Court judge in

Illinois and ultimately before the Honorable Stanley Birch, retired from the United States Court

of Appeals for the Eleventh Circuit, a settlement was reached and preliminarily approved by the

court.  (Doc. 47.)  Class Counsel now moves the Court to order final approval to the $ 1.425

million cash settlement as well as substantial additional monetary and equitable relief, including correction of all class members' consumer reports and access to approximately $90.00 in credit monitoring subscriptions. (Settlement Agreement ¶ 4.1 & 4.3)(Doc. 46-1.)  Such consideration is made for a narrow release that included the right of any class member who asserted or claimed to have suffered actual damages the right to preserve those damage claims.

In addition, Class Counsel moves for an attorneys fee award of $500,000.00 and a service award to Mrs. Souter of $7,500.00 to be paid from the Settlement Fund, which TU does not contest, as agreed by the Parties and memorialized in the Settlement Agreement. (Settlement Agreement ¶ 5.1.)

On July 26, 2010, Plaintiff Donna K. Souter filed a Class Action Complaint (the "Lawsuit"), asserting class claims against TU alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*  Specifically, Mrs. Souter alleged violations of 15 U.S.C. § 1681e(b) of the FCRA, which provides in relevant part:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b). Mrs. Souter alleged that Trans Union had a uniform policy of including Virginia state-court judgments in the consumer reports it prepares and sells, and listing the judgments as unpaid, when actual court records showed that such judgments had in fact been satisfied, vacated or appealed. As a result, up to 160,876 consumers may have had an inaccurate consumer report issued about them by Trans Union.

Although this case followed and was, for a period of time, stayed because of the pending

appeal of a similar case against Equifax Information Services, LLC[1], the Parties in this action have litigated independently of the Equifax case.  The Parties served and conducted both informal and formal discovery.  They have examined and defended the claims as they uniquely relate to Trans Union.

TransUnion vigorously denied all claims asserted against it in the action and Amended Complaint.  It contended that its past and current procedures with respect to collecting and reporting public records, and handling disputes relating thereto, were reasonable and compliant with the FCRA.  And TransUnion opposed class certification.  That later obstacle became a greater defense leverage when the United States Court of Appeals for the Fourth Circuit reversed the grant of class certification in the Equifax matter because the breadth of the class definition covered atypical time periods.[2]

Plaintiff, Class Counsel, TransUnion and TransUnion's Counsel engaged in extensive, good faith, arms'-length negotiations under the supervision of U.S. Magistrate Judge M. Hannah Lauck, as well as two, in-person private mediations.  One was facilitated by the Hon. Wayne Anderson (Ret.)[3], JAMS in Chicago, and the other by the Hon. Stanley Birch (Ret.)[4], JAMS, in

---

[1] *Donna K. Soutter, et al. v. Equifax Information Services, LLC*, Civil Action No.: 3:10-cv107 (E.D.Va.)(Payne).

[2]  *Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260 (4th Cir. 2012).  The Plaintiff's narrowed Motion for Class Certification has now been briefed and is pending before Senior District Court Judge Payne.

[3] Judge Anderson retired from the United States District Court for the Northern District of Illinois.

[4] Judge Birch retired from the United States Court of Appeals for the Eleventh Circuit.
[2]  *Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260 (4th Cir. 2012).  The Plaintiff's
[5] In calculating the opt-out rate, Class Counsel assumed that 84% of all class members had been narrowed Motion for Class Certification has now been briefed and is pending before Senior successfully found and reached by mail, thus yielding a .000759% opt-out rate.  (McGladrey District Court Judge Payne.
Decl. ¶¶ 3-6).  The opt-out to the entire class size is just .000622%.

[6] Class Counsel moves herein for an award of attorneys fees, but intends no disrespect in r
[3]  Judge Anderson retired from the United States District Court for the Northern District of
Illinois.

[4] Judge Birch retired from the United States Court of Appeals for the Eleventh Circuit.

Atlanta.   The negotiations and mediation sessions finally resulted in an agreement on the principal terms of the settlement.   Plaintiff and her counsel have concluded that the settlement now brokered before Judge Birch is fair, reasonable, adequate and in the best interests of the Class based upon their investigation and discovery, and taking into account the sharply contested issues involved, the uncertainty and cost of further prosecution of the Action, and the substantial benefits to be received by the Settlement Class pursuant to this Agreement.

Even though the original Complaint in this case was filed in 2010, the Plaintiff's legal team researched the case against TransUnion and began pre-filing work as early as 2008. That team continued to prepare for the filing of this class case through the summer of 2011.

Class counsel sought to negotiate as narrow a release with as substantial a cash recovery as could be fairly achieved.  In addition, the Parties included a substantial equitable benefit to the class as part of the Settlement by providing correction of every Class Member's credit report, as well as six months of TU credit monitoring services. Following the agreement on the terms of the settlement, including the equitable relief, cash payments, and reservations of rights process, there were additional terms – claims process, notice, costs and attorneys' fees – that also had to be negotiated and agreed. Over the course of several weeks following the settlement, the parties endeavored to memorialize the terms of the settlement into a Settlement Agreement, practically right up until the moment it was filed with the court.   After the Parties filed the Settlement Agreement and the Preliminary Approval Order was entered, the development of the class list took an unexpected turn.

The Court entered an order preliminarily approving the class action settlement on December 19, 2013.  (Doc. 47.)  Pursuant to section 7.2 of the Settlement Agreement, within five days of entry of the Order, the Defendant was to supply the class list to the Class Administrator.

Section 7.3 provides that the class notice was to be mailed by January 20, 2014, and that class members wishing to exclude, object or to submit a claim must do so by March 3, 2014. The Court originally set the matter for a final approval hearing on March 19, 2014. However, shortly after entry of the Order, the parties experienced several obstacles in assembling the class list, which required the involvement of a third-party and issuance of subpoenas to LexisNexis to obtain certain class member information. LexisNexis objected to the subpoenas, and a meet and confer process ensued.

The parties worked diligently to establish the class list, including conferring with LexisNexis on the scope of the third-party subpoena to obtain class member information without involving the Court. However, it was not until the end of April of 2014 that LexisNexis provided the information necessary to finalize the class list, thus it was impossible to mail out the notices to class members any sooner than they were.

As explained below, this Settlement is an excellent result for the Class. It provides significant economic and equitable relief. It offered a monetary payment to each class member who filed a claim asserting some injury. However, Class members who suffered actual damages were still able to preserve those damage claims and proceed through a mediation process to determine their individualized damages, or if not resolved to file an individual lawsuit. No class member, attorney, public interest group, or government agency (i.e. Attorneys General, Federal Trade Commission) has voiced an objection.

McGladrey LLP served as Class Administrator. (Declaration of Frank Barkan on behalf of McGladrey LLP)(Ex. 1). Defendant delivered to McGladrey a total of three mailing lists, the final of which contained approximately 206,013 names. (McGladrey Decl. ¶ 3). McGladrey then undertook the task of comparing the TU list with the Virginia Supreme Court Master File,

to eliminate individuals whose judgments were not indicated to be satisfied, vacated or dismissed. (McGladrey Decl. ¶ 3). The resulting list contained 160,876 Class Members that met the Class Definition and to whom McGladrey mailed notices on April 25, 2014. (McGladrey Decl. ¶ 5). A total of 25,582 notices were returned as undeliverable. (McGladrey Decl. ¶ 6.) McGladrey was able to find a new address for 97 of the returned notices, which were re-mailed. (McGladrey Decl. ¶ 6). Therefore, a total of 135,391 notices were delivered, or an 84% delivery rate.

Out of class members that received notice, the Settlement has produced only one request for exclusion (opt out), or a .0007% opt-out rate.[5] (McGladrey Decl. ¶ 8). The rate of objections is even lower, with not a single objection to the settlement. (McGladrey Decl. ¶ 9). As of the date this memorandum was filed, no objections were filed pursuant the Notice and the Court's Order.

## II.     THE SETTLEMENT, NOTICE AND CLAIMS PROCESS

### A.     Settlement Terms

The Settlement Fund is $1.425 million (Settlement Agreement ¶ 4.3), from which each class member who filed a claim will receive a check for a share of the cash fund, less attorneys' fees, costs, and class representative service award, if awarded by the court. (Settlement Agreement ¶ 7.1, 4.5). The parties have agreed that TU will not contest Class Counsel's request for attorneys' fees of $500,000.00, a service award to Donna Soutter of $7,500.00, and reasonable costs all to be deducted from the settlement fund. (Settlement Agreement ¶ 5.2).

#### 1.     The Class

---

[5] In calculating the opt-out rate, Class Counsel assumed that 84% of all class members had been successfully found and reached by mail, thus yielding a .000739% opt-out rate. (McGladrey Decl. ¶¶ 3-6). The opt-out to the entire class size is just .000622%.

The court preliminarily approved the following settlement class definition:

"Settlement Class," solely for purposes of this Settlement, means, includes and refers to all consumers in the United States who, between July 26, 2008, and the date of preliminary approval of the Settlement, had a hard inquiry on their TransUnion File resulting in the delivery of a TransUnion consumer report that reflected an unsatisfied Virginia General District Court or Virginia Circuit Court civil judgment, if at least 31 days prior to delivery of the consumer report, and on the date of delivery of the consumer report, such judgment had been satisfied, vacated or dismissed, as shown by the VSC Master File.

There are 160,876 Settlement Class Members.

### 2.      Settlement Consideration

The most important value and settlement term is the full correction of the substantial credit reporting inaccuracy that was reporting as to class members before settlement.   Class counsel and the Class Administrator were able to identify each such consumer file by working from the data Trans Union provided and that obtained from the Executive Secretary of the Supreme Court of Virginia.  Every single Class Member is thus benefited regardless of whether they filed a claim, reservation of rights to receive actual damages, or requested a credit monitoring subscription, each consumer will have the inaccurate and derogatory credit reporting corrected.   (Settlement Agreement ¶ 4.4).   TU began implementing this important set of corrections after the Court granted Preliminary approval. The correction of the credit report is extremely valuable to each class member, and uniquely a product of the Settlement because it is relief that is otherwise not available through litigation. The FCRA provides only for money damages as a remedy, not correction of the consumer report. This relief inures to the benefit of every one of the 160,876 Class Members, and will have true money value to every Class Member perhaps worth thousands of dollars to many, but at least hundreds of dollars to all.

The Settlement Agreement also requires Defendant to pay $1.425 million into a Settlement Fund for the benefit of the Settlement Class.  All Class Members were eligible to

receive the benefit of a Credit Monitoring Subscription without having to supply a credit card or other method of payment to activate the subscription.   (Settlement Agreement ¶ 4.1).   The subscription itself has an actual monetary value of $89.70 and was made available to each and every Class Member, not just the members that filed claims.   As of the date of this memorandum, 4,227 class members requested credit monitoring, with a market value of $379,162.00. (McGladrey Decl. ¶ 11).

In addition, Class Members were permitted to preserve their actual damages.   Defendant is obligated to consider individual class member demands for actual damages and a process is set up to further resolve these claims on an individualized basis.   (Settlement Agreement ¶¶ 8.4, 8.5).   This feature of the Settlement is an exceptional benefit to the Class Members who have suffered some type of actual damage resulting from the inaccurate report, which could range from denial or loss of credit to being denied a job or refused a lease.   The Settlement Agreement provides for a formal procedure, administered by McGladrey, in which Class Members will supply their evidence or documentation of the damage they suffered and TransUnion will within 45 days make a good faith settlement offer to each of the 49 Class Members who reserved rights. (Settlement Agreement ¶ 8.5).

Finally, Class Members who filed a claim will receive a cash payment for statutory damages.   Under the FCRA, statutory damages are available between $100 and $1,000.   15 U.S.C. § 1681n.   If the Court enters a Final Approval Order, the Settlement Fund will provide each Settlement Class Member with an average gross settlement amount of $265.00 before deduction of attorneys' fees, incentive award, and costs, if approved by the court.

The comprehensive nature of this Settlement takes into account the very complex nature of a consumer's damages resulting from an inaccurate and derogatory credit report.   The

Settlement provides consumers with immediate and tangible benefits such as an accurate consumer report and the ability to access a credit monitoring service, to actual cash payments.

### 3.        The Release

Class Counsel negotiated the narrowest release possible under the circumstances based on the practices described in the litigation and the information obtained through formal and informal discovery.

### 4.        Notice to the Class

The notice program described in the Settlement Agreement and approved in the Preliminary Approval Order was designed to reach as many Class Members as possible, using First Class U.S. mail as well as a Settlement Website.  The Class Administrator used both electronic and traditional means to contact the most Class Members as possible.  Even prior to mailing the notices, the Parties, together with LexisNexis and the Class Administrator, engaged in months-long process of ensuring that the list was comprehensive and complete.  The names and addresses for the Notice came from the information maintained by TU and LexisNexis. The Class Administrator reports an 84% effective delivery rate, which is an acceptable rate. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, 3:05cv00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with approximately 85% delivery rate); *In re Zurn Pex Plumbing Prod. Liab. Litig.*, No. 08–MDL–1958 ADM/AJB, 2013 WL 716088 (D. Minn. Feb. 27, 2013) (approving settlement where 80.6% of the class received notice).

### B.        The Notice Process is Complete.

In accordance with the Preliminary Approval Order, Class Counsel retained a national class administration company, McGladrey LLP, to accomplish the notice and claims process for the settlement.  All actions taken by the Class Administrator to date have been under the direct supervision of Class Counsel with many communications, decisions and consultations required between the administrator and class counsel through the notice process.  In addition, Class Counsel and Defendant's counsel have consulted and worked together throughout the notice and claims process to reach consensus on its day-to-day implementation.

The class notice process itself was negotiated and ultimately implemented. This process was certainly the best available given the factors of this case. While it is almost always difficult to obtain current addresses and identification information on class members, the Parties and Administrator were able to minimize this problem in this case by obtaining up-to-date and as complete information as possible from LexisNexis.

On April 25, 2014, the Class Administrator initially sent 160,876 Notices by First Class U.S. Mail.  (McGladrey Decl. ¶¶ 4-6). Of the Notices that were mailed, a total of 25,485 were undeliverable. (McGladrey Decl. ¶ 6).

In addition to the mailed Notices, the Class Members and the general public could also access a website http://soutterclassaction.clalegal.com/ to file a claim, reservation of rights, or to obtain all the information contained in the Notice, as well as the Settlement Agreement, Order of Preliminary Approval and contact information of Class Counsel and the Settlement Administrator. (McGladrey Decl. ¶ 7). The website established by the Class Administrator had more than 7,590 visitors. (McGladrey Decl. ¶ 7).  The Class Administrator also established a toll-free telephone number dedicated to the Settlement in this case, which provided automated answers to frequently asked questions, the ability to request the copy of the Notice packet by

mail, and contact information for Class Counsel. (McGladrey Decl. ¶ 10). As of May 27, 2014, 4,812 people called the toll-free number. (McGladrey Decl. ¶ 10).   As of the date of this memorandum, Class Counsel received 745 total phone calls at the offices of Consumer Litigation Associates, P.C. (CLA) where Class Members were assisted by a live person.   The individuals answering Class Member questions included all seven CLA attorneys, three paralegals and three legal assistants.   (Affidavit of Dawn Chaffer)(Ex. 2).   Class Counsel also received and responded to 105 emails.   (Chaffer Aff. ¶ 3).   Each member of Class Counsel's team provided assistance to Class Members to help them understand the content of the notice, the deadlines, and their rights. (Chaffer Aff. ¶ 2-3).

The Supreme Court has concluded that notice sent by first class mail to each class member satisfies due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985).

The website operated by the Settlement Administrator provided further notice and access to information in order to:   (1) enable Settlement Class Members to access and download the Class Notice, Settlement Agreement, Preliminary Approval Order; (2) enable Settlement Class Members to download an exclusion form, claim form and reservation of rights form, free credit monitoring subscription activation code; (3) provided a list of critical dates and deadlines in the settlement process; and (4) provided contact information for Class Counsel.

C.    **Settlement Results**

Each class member receives the real and tangible benefit of a corrected consumer report. For consumers who filed a claim, reservation of rights or requested credit monitoring, their benefit has a monetary value that is more readily measured. The minimum net payment to be

made to class members who filed a claim is in cash, unconditional and meaningful.[6]   Class Members, including the consumers who filed a claim, give up few of their rights, release only the narrowest of claims, and obtain a cash benefit without otherwise having to commence any litigation of their own.   Indeed, even the consumers who reserved their rights, must only submit documentation of their damages to which TU will respond with a good faith settlement offer, which enables them to avoid instituting separate litigation.

The Settlement is structured to provide several different types of relief, which are for the most part not exclusive, but that have meaningful benefits to consumers with an inaccuracy on their credit report.   The combination of corrected reports for all class members, the availability of credit monitoring to all class members, the cash payment to Class Members that filed a claim, the process for establishing actual damages to those who reserved their rights, comprise an excellent result for the Class.

### D.   Class Member Reaction

Unquestionably, the settlement is an excellent result for the class. Indeed, the fact that there were no objections and only one exclusion speaks volumes.   Whether the Court considers the thousands of class members who neither objected nor opted out, the 4,812 who affirmatively telephoned the Administrator, the 745 who connected to a live person in Class Counsel's offices for information about the settlement (McGladrey Decl. ¶10; Chaffer Aff. ¶ 2-3), the collective voice of the Class is overwhelmingly positive.   By any account, this settlement is a resounding success for the class members.   In fact, the percentage of the class that excluded or objected is so small, it is insignificant. The cash benefits are substantial, but each and every Class Member

---

[6] Class Counsel moves herein for an award of attorneys fees, but intends no disrespect in providing the calculation of net payment to each class member by taking into account the deduction of attorneys' fees, administration costs, and service award requested.

received the most substantial benefit, uniquely available in settlement and not at trial, which is the correction of the inaccuracy in their credit report.  This correction would not have occurred had Mrs. Souter not brought her case.

The lack of objections and opt out/exclusion requests are indeed notable.  Given the size of the class, Class Counsel expected a number of "class action attorneys are greedy" or "TransUnion should be put out of business" objections, but none were made.  And certainly it is unusual that even professional objectors or "greenmailers"[7] could not find a basis to challenge the settlement.

## III.   ARGUMENT

### A.   The Proposed Settlement is Fair, Reasonable, and Adequate and Should Be Approved.

#### 1.   The Standard for Judicial Approval of Class Action Settlements

There is a strong judicial policy within this Circuit favoring resolution of litigation prior to trial. *See e.g., S.C. Nat'l Bank v. Stone,* 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank,* 216 U.S. 582 (1910)). Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the court in *S.C. Nat'l Bank* observed:

---

[7] '[P]rofessional objectors' almost invariably groundless objections delay the provision of relief to class members who, in most instances, have already waited years for resolution. Second, by feeding off the fees earned by class counsel who took the risk of suing defendants on a purely contingent basis, as is the normal practice in class actions, professional objectors create a disincentive for class counsel to take on such risky matters. That disincentive clashes with the public interest, repeatedly recognized by courts, to incentivize class counsel to handle such cases."

Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's L. Rev. 949, 951 (2010).

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

749 F. Supp. at 1423 (quoting *Armstrong v. Bd. of Sch. Dirs.,* 616 F.2d 305, 313 (7th Cir. 1980)).

In order to safeguard the interests of the absent class members, all class settlements and the corresponding later dismissal of the case, requires Court approval. Fed. R. Civ. P. 23(e)(1)(A). The process for that approval is governed by Rule 23(e), which provides, in relevant part:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
>
> (2) The parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

Rule 23(e) thus imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members." Fed R. Civ. P. 23(e)(1)(B). Second, the Court must determine that the settlement "is fair, reasonable, and adequate." The parties address each of these requirements.

Federal jurisprudence strongly favors resolution of class actions through settlement. *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999); *see* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002)

("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Rule 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval is required to ensure that the parties gave adequate consideration to the rights of absent class members during settlement negotiations. *Henley v. FMC Corp.,* 207 F. Supp. 2d 489, 492 (S.D. W. Va. 2002) (*citing In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991)). The Court may approve a settlement only after a hearing and on finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). Additionally, "there is a strong initial presumption that the compromise is fair and reasonable." *Id. (quoting S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. at 339).

In determining whether a given settlement is reasonable, the court should avoid transforming the hearing on the settlement into a trial on the merits regarding the strengths and weaknesses of each side of the case. *Flinn v. F.M.C. Corp*, 528 F.2d 1169, 1172-73 (4th Cir. 1975). Ultimately, the approval of a proposed settlement agreement is in the sound discretion of the Court. *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995)(citing *Jiffy Lube*, 927 F.2d at 158).

### 2.   The Notice to the Class Members was Reasonable.

In a settlement class maintained under Rule 23(b)(3), the class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies

that "[n]o class action may be "dismissed or compromised without [court] approval,' preceded by notice to class members." Fed. R. Civ. P. 23(e). Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th 2004).

The class list was compiled by the Defendant, with information from third-party LexisNexis to ensure completeness. The Class Administrator then compared the Defendant's mailing list against the Virginia Supreme Court's Master File. The Notices were sent by First Class U.S. Mail to Class Members. A Settlement Website was established, and Class Members were able to contact the Class Administrator and Class Counsel to answer questions, which they did. After a re-mailing process, the Class Administrator determined that 16% of the notices were undeliverable.

The efforts used to identify class member addresses is absolutely as thorough as could have been accomplished. With 160,876 members, it was a large class, but it was also susceptible of accurate identification because Class Member records were maintained by TU and LexisNexis. With an approximate 84% delivery rate, it appears that the delivery of notices was not only an acceptable delivery method, it was a successful delivery method.

As this Court explained, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification

methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.,* 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). The Supreme Court has concluded that direct notice satisfies due process, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812-13 (1985), and other courts – including this court and others within the Fourth Circuit – have approved mailed-notice programs that reached a similar percentage of class members than the class notice reached in this case.

TransUnion also served notice of this settlement on the relevant state and federal authorities as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715. (Declaration of Stephen J. Newman)(Doc. 53). As reflected by the absence of any appearance under CAFA on the Court's docket, none of these agencies or states have objected to the Settlement.

The Parties' efforts to provide class members with notice of the settlement makes in clear that such notice was the best available notice under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. The Parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the Class Members were notified – in the best and most direct manner possible – of the Settlement's terms and excellent benefits.

### 3. An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Fair and Reasonable.

The next phase of the Court's determination of compliance with Rule 23(e)(1)(c) typically requires a two-part analysis, often referred to as the *Jiffy Lube* factors. The Court must determine whether the settlement is "fair and reasonable" and then whether the settlement is "adequate." The approval of a proposed settlement agreement is in the sound discretion of the Court. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

17

The first step in the *Jiffy Lube* analysis is a determination as to the fairness of the settlement. The fairness factors are critical to the protection of the class members from unscrupulous class counsel and relate to whether there has been arm's length bargaining. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983); *S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991). The court must consider four factors: (i) the posture of the case at the time of settlement; (ii) the extent of discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of counsel. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158-59; *see also In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 663-64; *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's length negotiations. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339. As described below, the settlement reached in this case is clearly fair and each of the *Jiffy Lube* factors are satisfied.

The Parties agreed to settle only after conducting sufficient merits-related discovery, both formally and informally. The Parties also conducted extensive and substantive settlement talks, including not only with Judge Lauck, but also by engaging two retired federal judge as private mediators. There were numerous contacts between counsel leading up to and following each settlement session.   It was not possible to settle the case at an earlier posture – not only were several in-person mediation sessions required, so too were a great deal of negotiations during the discovery period as well as active litigation. The Plaintiff engaged in extensive strategizing and research to determine how to litigate this case in light of the history of *Souter v. Equifax*, and its trip to the Fourth Circuit and back.

The posture of the case at the time of settlement is a factor that supports approval. *See In*

*re Microstrategy, Inc.*, 148 F. Supp. 2d at 664 (approving of proposed settlement despite the fact that it was reached "early" in litigation). The allegations in this case were for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*. Specifically, this case arises under 15 U.S.C. § 1681e(b) of the FCRA, which provides in relevant part:

> Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. § 1681e(b).  Mrs. Soutter alleged that Trans Union had a uniform policy of including Virginia state-court judgments in the consumer reports it prepares and sells, and listing the judgments as unpaid, even though its records do not contain information on the current status of those judgments, any of which may have been satisfied, vacated or appealed since the date Trans Union last received data. As a result, a class of at least 160,876 consumers had an inaccurate consumer report issued about them by Trans Union; these consumer reports showed an unpaid judgment when in fact the court records showed that the judgment had been satisfied, vacated or appealed at least thirty days before Trans Union's report was prepared.

There are advantages to the parties and to the docket when opposing counsel are already experts on the legal and factual issues in a case and in a field of practice. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law). Experienced counsel negotiated the Settlement, making it their first priority bringing the best benefit possible to their clients, and in Plaintiffs' cases, to the Class.

Class Counsel is experienced in both class action litigation and consumer protection litigation.  Leonard Bennett, Matthew Erausquin, Susan Rotkis, Janelle Mason Mikac and Casey Nash of Consumer Litigation Associates, P.C., have extensive collective experience in both

consumer protection and class action litigation, having been involved in now numerous, large consumer class actions where they have been found to be suitable Class Counsel. *See e.g. Soutter v. Equifax Info. Servs., LLC,* 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *See, e.g. Williams v. Lexis-Nexis Risk Mgt.,* No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart,* No. 3:07Cv469 (E.D.Va. 2007); *Capetta v. GC Servs., Inc.,* No. 3:02cv288 (E.D. Va.); *Ryals v. HireRight Sols. Inc.,* No. 3:09CV625 (E.D.Va.), *Daily v. NCO,* No. 3:09CV031 (E.D.Va. 2011); *Conley v. First Tennessee,* No. 1:10CV1247-TSE (E.D.Va.)*; Lengrand v. Wellpoint,* No. 3:11CV333-HEH (E.D.Va.); *Henderson v. Verifications Inc.,* No. 3:11CV514-REP (E.D.Va. 2013).

The Parties also engaged in discovery sufficient to aid Counsel and the Court in evaluating Plaintiffs' claims and Defendant's defenses. These facts further point to the conclusion that the Proposed Settlement was the product of arm's-length negotiation by experienced counsel and thus warrants preliminary approval. *See In re Jiffy Lube*, 927 F.2d at 159; *see also Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995) (concluding fairness requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

The Parties fairly reached the Settlement as a result of an arm's-length negotiation process with the assistance of both a United States Magistrate Judge and private mediators, who are retired federal judges.  These facts surrounding the negotiations more than satisfy the requirement that the settlement not be one brokered through "collusion or coercion." *See, e.g.,*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005); *Weiss v. Regal Collections*, Civ. No. 01CV881-DMC, 2006 WL 2038493, at *2 (D.N.J. July 19, 2006).

       **4.**       **An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Adequate**

The Court must also determine whether the proposed class settlement is substantively "adequate," the second prong of the *Jiffy Lube* analysis. The Fourth Circuit's decision in *Jiffy Lube* teaches that the adequacy inquiry is guided by evaluating: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In re Jiffy Lube,* 927 F.2d at 159. Plaintiff has at all times believed that this case was very strong in several regards, including being able to establish basic FCRA liability and that the named Plaintiff was typical not only of the Class but also of consumers who had an inaccurate report about a Virginia judgment appearing on their TU consumer report. However, the Defendant was prepared at all times to contest the class certification. Under the FCRA, liability can be established either upon a showing of negligent or willful noncompliance.  15 U.S.C. §§ 1681n & 1681o.  If negligent noncompliance is proven, a consumer may recover actual damages.  In the case of willful noncompliance, a consumer may recover statutory and punitive damages.  As a practical matter, the Plaintiff would have to proceed as a class either under a theory of negligence and thus prove uniform actual damages, or proceed under a willfulness theory requiring the higher standard of proof in order to recover statutory and punitive damages. Either way, the Plaintiff would be required to produce adequate evidence for a jury to find that TU violated the FCRA.  Without the certainty afforded both sides in the approval of the class settlement, all parties would have

proceeded with a long, expensive litigation process likely to culminate in a trial on the merits likely followed by an appeal.

Despite the fact that Plaintiff's counsel and Defendant's counsel were at all times professional, it was nonetheless contentious as each side zealously represented the interests of their clients. TransUnion retained several prestigious law firms to defend this case, including FCRA specialists at Stroock & Stroock & Lavan LLP, a New York-based national law firm with more than 300 lawyers working in offices in New York, California, Florida, and Washington, D.C.   Stroock assigned one of its most experienced partners in class action and consumer financial services litigation to this case, which factor alone could have impacted the outcome of the case at any stage.   In addition to Stroock, TU also engaged similarly FCRA specialized Strasburger & Price LLP, a Texas-based international law firm.   The attorneys of Strasburger & Price regularly represent TU opposite Class Counsel, and are extremely experienced in litigation and, in particular, the FCRA.

The determination of when it is appropriate to settle a case is one that is entrusted to experienced class counsel. It is often difficult to transition off of a litigation track that is focused on an upcoming trial and meeting the various burdens of proof to a mindset that considers that every case – no matter how conceivably strong it may seem – will always have an element of risk at its core. Settlement is the only outcome that allows both sides to be assured of a certain ending to the litigation, alleviating both the risk and cost inherent in further litigation to both sides, as well as the additional burden on the Court. This case was no exception, and in fair consideration of the strengths and weaknesses (as well as with significant involvement by the mediator), Plaintiffs' counsel felt that settlement was appropriate at this juncture because of the excellent result for the class based on the allegations in the Amended Complaint. *See Cardiology*

*Assocs., P.C. v. Nat'l Intergroup, Inc.*, No. 85CV4038, 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 740 (D.W.V. 1970)); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 667.

Given the risks to both sides, and the possibility that the Plaintiff may not prevail at trial, the *Jiffy Lube* factors militate in favor of the adequacy of the settlement. By its terms, the settlement provides substantial benefit of credit report correction as consideration to all class members. In addition, every class member was eligible for six-months of a credit monitoring subscription, and to file a claim for a share of the Settlement Fund or to reserve his or her rights to claim actual damages. These benefits realized by the class members immediately are significant, particularly given the impact of a judgment inaccurately appearing on one's consumer report and, for those who made claims, the time value of money. A dollar realized today is worth considerably more than the same dollar finally collected years later, even assuming the success on the merits and on appeal, and the ability to collect any judgment that was rendered. This factor weighs in favor of the adequacy of the settlement.

Despite mailing 160,876 total notices, no class members have objected and only one opted out. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to

object, after notice to the settlement is a proper consideration for the trial court.' *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4ᵗʰ Cir. 1975)." *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 668. As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy" *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989). "The small number of objections necessarily must be evaluated relative to the size of this Class of over 1 million members. In litigation involving a large class it would be "extremely unusual" not to encounter objections. *See In re Anthracite Coal Antitrust Litig.,* 79 F.R.D. 707, 712–13 (M.D.Pa.1978), *aff'd in part,* 612 F.2d 571 and 612 F.2d 576 (3d Cir.1979)." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 478-79 (S.D.N.Y. 1998). Where "[t]he parties objecting to the settlements are both qualitatively and quantitatively insignificant," their objections may be disregarded. *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1327 (5th Cir. 1981), *cert. denied sub nom. CFS Continental, Inc. v. Adams Extract Co.*, 456 U.S. 998 (1982). Courts recognize that where the class as a whole supports a settlement, it should be approved.[8] Indeed, even a small majority of support creates a presumption in favor of approval. *See Reed v. Gen'l Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (approving class action settlement where more than 40 percent

---

[8] *See, e.g., In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979), *cert. denied sub nom. Iowa Beef Processors, Inc. v. Meat Price Investigators Ass'n*, 452 U.S. 905 (1981); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir.) (20 percent opted out or objected; settlement approved), *cert. denied sub nom. Abate v. Pittsburgh Plate Glass Co.*, 419 U.S. 900, (1974); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (thirty-six percent; settlement approved); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (sixteen percent; settlement approved).

of class objected or opted out); *Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent opted out or objected; settlement nevertheless approved).

> **B.    The Court Should Approve Attorneys' Fees, Costs, and a Service Award to the Plaintiff**
>
> > **1.    Defendants agreed not to contest Plaintiff's motion for attorneys' fees and expenses in the amount of $500,000.00 as the successful party in the litigation, subject to court approval. (Settlement Agreement ¶ 5.1).**

The Supreme Court has consistently calculated attorneys' fees in common funds cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478-79 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984); *see also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund). The Supreme Court has never adopted the lodestar method over the percentage of recovery method in a common fund case, even when lower federal courts began using the lodestar approach in the 1970's. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp. 2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.

Since *Blum*, virtually every Circuit Court of Appeals has joined the Supreme Court in affirmatively endorsing the percentage of recovery method as an appropriate method for determining an amount of attorneys' fees in common fund cases. *See In re GMC*, 55 F.3d 768, 821-22 (3rd Cir. 1995); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002); *In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Camden I. Condo. Ass'n, Inc. v. Dunkle*, 946

F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp v. Shalala*, 1 F.3d 1261, 1268-70 (D.C. Cir. 1993); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2nd Cir. 2000).

 In the Fourth Circuit, attorneys' fees in common fund cases such as this one are almost universally awarded on a percentage-of-the-recovery basis. *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

 In this case, Plaintiff seeks $500,000.00 in attorneys' fees and expenses.  This request is well under 30% of the overall value of the settlement to the class, which includes not only the cash in the $1,425,000.00 in the Settlement Fund, but also the value of the correction of the inaccuracy in the consumer reports of each and every class member, as well as the value to 4,227 consumers who requested six-month subscription for credit monitoring.  The Fourth Circuit has not established a benchmark for fee awards in common funds cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 percent to 40 percent of the settlement fund. If the court were merely to look at the percentage of the fund, the requested fee is approximately 35% of Settlement Fund and within the range of awards approved by the Fourth Circuit.  Percentage-fee awards are exactly what the name suggests – class counsel fees are determined as a percentage of the total settlement fund.

This Court has recognized the importance of incentivizing experienced class counsel to take on risky cases. *See, e.g., In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorneys' fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 31, 33 (2004). This holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million). *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (table) (affirming district court's award of 25% of $1 million common fund) (unpublished); *In re Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006)(concluding the customary fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of 30% of the fund has

27

been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted).

In this case, the Defendant does not oppose Class Counsel's fee requests in the amount of $500,000.00.   The Court should consider the full value of the Settlement to the Class when considering whether the attorneys' fees are reasonable.  As with any class case that they agree to take on, Plaintiffs' counsel live by the result that they obtain for the class members.  In this case, where Class Counsel bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation, Class Counsel submits that its requested fee, in light of the outcome for the class and the law of the Fourth Circuit, is reasonable.  Class Counsel in this case has consistently taken the position in all cases that the attorneys fee should be based on a percentage of the recovery obtained for the class. This has been true even in cases where the result is an objectively small fee such as in *Mayfield v. Memberstrust Credit Union*, 3:07cv506 (E.D. Va. Nov. 7, 2008), where the class size was so small that counsel's fee ended up being $8,300.00, well below the actual time counsel had invested in the case. Indeed, in *Conley v. First Tennessee*, 1:10cv1247 (E.D.Va.), counsel took the same consistent position with respect to a class of 350 consumer and resulted in recovery of an approved fee of only $20,000.00. (Docket No. 37).  The same is true in another case, *Lengrand v. Wellpoint*, No. 3:11Cv333-HEH (Docket No. 42), in which counsel requested a percentage of fund recovery even though the class size discovered was very small and the fee requested, $8,550.00, was a small fraction of the large fee counsel actually incurred in lodestar.  In each case, the standards of Rule 23 demand that Class Counsel represent the interest of the class with the same attention, zeal and competence whether the class numbers in the hundreds of thousands such as *Ryals v. HireRight Solutions*, or is less than a hundred as in *Lengrand v. Wellpoint*.

28

These matters, and others that resulted in dismissal or no class outcome, are the necessary context for this petition for what in raw dollars may seem to be a large fee.  In this litigation, as in all class cases, the attorneys who worked on this case have tied their fate to that of the class. The fee is substantial in this case for only one reason –the class, the equitable remedies and the cash recovery for the class are substantial. This symmetry of incentives between counsel and the class motivates Class Counsel to maximize class cash benefit to the largest degree possible.

In this case, Class Counsel shouldered the entire risk of the litigation, appropriately staffing it with experienced counsel, spending significant time to investigate the case prior to filing, strategically addressing issues raised in a dispositive motion, conducting the back and forth of discovery, vigorously litigating, and finally negotiating for almost a year to reach this result for the Class.  Doing so required zealously litigating a complex federal case while at the same time attempting to identify the terms where the parties might find compromise.  While the fee will be substantial – certainly so – it is well deserved and earned.  The risks taken should be compensated, as law recognizes.   But there was certainly substantial investment and risk incurred.  Class Counsel requests a fee based not only on their earned percentage of the cash fund obtained, but also for the benefit of the entire settlement.  Yet there is no doubt that the excellent outcome in this case for the Class was the result of risk-taking and really hard work by a group of skilled lawyers.

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members. Class Counsel's requested fee is $500,000.00, and when considered in light of the cash for the class as well as the value of the equitable remedies of credit reporting correction, credit monitoring and the reservation of rights process,  it is apparent

the fee requested is within and at the low end of the percentage of the value of the class relief. Even if the Court were to consider only the cash in the Fund, the fee of 35% is reasonable under the circumstances of this case and the applicable law.  The Court should award it.

**2.      The Court should grant Plaintiff's motion for a service award in the amount of $7,500.00.  (Settlement Agreement ¶ 4.5, 5.1).**

Courts generally recognize that "[i]ncentive or service awards reward representative plaintiffs' work in support of the class, as well as their promotion of the public interest." *Deem*, 2013 WL 2285972, at *6 (citing *Jones*, 601 F. Supp. 2d at 767).  Plaintiff requests, and the Defendant does not oppose, an incentive award for Mrs. Soutter, which she requests in the amount of $7,500.00 for her service as Class Representative. In this case, the Plaintiff chose to serve as the Named Plaintiff in this lawsuit after Class Counsel explained to her the responsibilities required. Cognizant of those responsibilities, Plaintiff began this lawsuit with the intent to vigorously pursue it, for herself and the benefit of the Class Members she represents. The Class Representative understand the theories of this lawsuit, she has kept abreast of the case's status, reviewed documents provided to her by Counsel, and discussed with Counsel aspects of the case, discovery issues, and settlement negotiations. Service awards have been regularly approved by judges in the Eastern District of Virginia in cases such as this one where the class representative took a role in prosecuting the claims on behalf of the class.  *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va. April 27, 2011) (Judge Spencer approved a $5,000 service award to each named plaintiff); *Henderson v. Verifications Inc.*, No. 3:11cv514 (E.D. Va. Mar. 13, 2013) (Judge Payne approved a $5,000 service award to named plaintiff); *Pitt v. Kmart Corp., et al.*, No. 3:11cv697 (E.D. Va. May 24, 2013) (Judge Gibney approved a $5,000 service award to the class representative); *Conley, et al. v. First Tennessee Bank, N.A.*, No. 1:10cv1247 (E.D. Va. Aug. 18, 2011) (Judge Ellis awarded a $5,000 service award to each named

plaintiff); *Ryals, Jr. et al. v. HireRight Solutions, Inc.*, No. 3:09cv625 (E.D. Va. Dec. 22, 2011)

(Judge Gibney approved an service award to each class representative in the amount of $10,000);

*Shami v. Middle East Broadcasting Network, Inc.*, No. 1:13cv467 (E.D.Va. April 30,

2014)(Judge Hilton approved a service award of $10,000 as a service award to the named

plaintiff).  Here, the Named Plaintiff amply fulfilled her duties as Class Representative, making

the $7,500 service award appropriate.

## IV.   CONCLUSION

In summary, the Parties have reached a settlement in this case that provides genuine relief

to the class members. The settlement is an excellent result considering the contentiousness and

status of the litigation, the outcome actively mediated by Judge Lauck, Judge Anderson and

Judge Birch, the equitable relief and the amount of money that will be paid to each class

member. Each class member received the benefit of the settlement, regardless of whether they

were aware that the Defendant's conduct violated the FCRA and even whether they suffered

actual harm. In addition, the terms of the Settlement, as well as the circumstances surrounding

negotiations and its elimination of further costs caused by litigation this case through trial and

appeal, satisfy the Fourth Circuit's strictures for final approval. The Plaintiff respectfully moves

the Court to grant the Plaintiff's Motion for Final Approval of the Settlement Agreement, which

is not contested by the Defendant.

Respectfully Submitted,

Donna K. Soutter, on behalf of herself and others similarly situated,


_____/s/_____
Leonard Anthony Bennett
VSB 37523
Susan M. Rotkis

31

VSB 40693
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News VA 23601
757-930-3660
757-930-3662
srotkis@clalegal.com
lenbennett@clalegal.com

Janelle Mason Mikac
Matthew J. Erqausquin
Casey Nash
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Phone: (703) 273-7770
Fax: (888) 892-3513
Matt@clalegal.com
Casey@clalegal.com
Janelle@clalegal.com

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

On this 31st day of May, 2014, I certify that I have electronically filed the foregoing

pleading in the CM/ECF system, which shall send a Notice of Electronic Filing (NEF) to:

Grant E. Kronenberg
Michael Robert Ward
Morris & Morris PC
11 South 12th Street
5th Floor
PO Box 30
Richmond, VA 23218
E-mail: gkronenberg@morrismorris.com
Email: mward@morrismorris.com

Matthew Kasey Ratliff
Strasberger & Price, LLP
901 Main Street, Suite 4400
Dallas, TX 75202
E-mail:  kasey.ratliff@strasburger.com

Paul Lee Myers
Strasburger & Price, LLP
2801 Network Boulevard
Suite 600, Frisco, TX 75034
E-mail:  paul.myers@strasburger.com

Stephen Newman
Stroock, Stroock & Lavan, LLP
2029 Century Park East
Suite 1600
Los Angeles, CA 90067-3086
E-mail:  snewman@strook.com

_____/s/_____
Susan M. Rotkis
VSB 40693
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News VA 23601
757-930-3660
757-930-3662
srotkis@clalegal.com
